**KEYSTONE CAMERA PRODUCTS CORPORATION, Plaintiff,**

v.

**ANSCO PHOTO–OPTICAL PRODUCTS CORPORATION and W. Haking Enterprises Limited, Defendants.**

No. 87 C 1157.

United States District Court, N.D. Illinois, E.D.

July 17, 1987.

Michael O. Warnecke, Neuman, Williams, Anderson & Olson, Richard A. Cederoth, Chicago, Ill., Arnold Baum, Keystone Camera Corp., Clifton, N.J., Stuart A. Summit, Summit, Rovins & Feldesman, New York City, for plaintiff.

Robert E. Wagner, Russell E. Hattis, Linda A. Kuczma, Wallenstein, Wagner, Hattis, Strampel & Aubel, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiff, Keystone Camera Products Corporation ("Keystone"), has sued defendants, Ansco Photo-Optical Products Corporation and W. Haking Enterprises Limited [1] (collectively referred to as "Ansco") for alleged trade dress infringement in violation of federal and state laws. Keystone and Ansco are both manufacturers of cameras which they sell worldwide in competition with each other. The dispute in this case involves a new line of cameras introduced by Keystone in December of 1986 bearing the registered trademark name "Le Clic".[2] The Le Clic camera line consists of standard model camera bodies adorned by contrasting, multiple colors.[3]

---

1. Ansco Photo-Optical Products Corporation is a subsidiary of W. Haking Enterprises, Limited. Pursuant to the Stipulated Order of May 18, 1987, agreed to by all the parties, Ansco's parent, W. Haking Enterprises, Limited, has consented to the jurisdiction of this court as to the ruling on the preliminary injunction rendered by this court.

2. There is no claim that the "Le Clic" trademark was infringed by Ansco. The dispute between

the parties revolves around what Keystone claims is the "Le Clic look," defined by Keystone's president Mark Auerbach as the use of nonblending or clashing multicolors on the product in conjunction with a graphic design. (Hearing Tr. 207–08).

3. The entire Le Clic line consists of the Le Clic 110 cameras (Pl. Exs. 2–5), the Le Clic disc cameras (Pl. Exs. 17–20), the Le Clic 35 mm cameras (Df. Exs. 8 and 37), the Le Clic "Ultra"

The essence of Keystone's claim is that Ansco has appropriated the "trade dress" of certain of Keystone's Le Clic cameras. By motion Keystone has sought preliminary injunctive relief under section 43(a) of the Lanham Act and state law. The court conducted a hearing and herein makes its findings of fact and conclusions of law.

A preliminary injunction will issue only where there is an affirmative finding of the following factors: (1) that the movant seeking injunctive relief has no adequate remedy at law and will suffer irreparable harm if the injunction does not issue; (2) that the movant has "some" likelihood of success on the merits; (3) that the balance of the relative harms weighs in favor of the movant; and (4) that the public interest will not be disserved if the injunction issues. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986).

■ It is generally recognized in trademark infringement cases that (1) there is not an adequate remedy at law to redress infringement and (2) infringement by its very nature causes irreparable harm. *Processed Plastic Co. v. Warner Communications*, 675 F.2d 852, 858 (7th Cir.1982). This case involving an alleged trade dress infringement is no exception.

The court therefore addresses the question whether, after viewing the evidence adduced at the preliminary injunction hearing, Keystone has some likelihood of success on the merits. In making this determination the court must consider Keystone's arguments as to the facts adduced.

Keystone claims that it has a protected trade dress under the Lanham Trademark Act for the Le Clic "look" which it created for its new line of cameras. Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), provides that:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services or any container or containers for goods a false designation of origin or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of such false description or representation.

15 U.S.C. 1125(a).

The court must first determine upon which specific prohibition of section 43(a) plaintiff seeks to rely. Keystone alleges that Ansco's cameras infringe the trade dress of Keystone's "Le Clic" camera line and constitute "a false designation of origin in commerce." [4] (Complaint, ¶ 22).

The facts alleged in Keystone's complaint more appropriately support a claim for false representation, rather than a "false designation of origin" claim. Therefore, and in light of the liberal pleading requirements of the Federal Rules of Civil Procedure, the court construes plaintiff's claim under section 43(a) as one alleging false representation.

■ Semantics aside, to prove a false representation violation of section 43(a), a

---

cameras (Df. Ex. 42) and the Le Clic "plus" cameras. Keystone claims trade dress infringement by Ansco only of the Le Clic 110 and disc cameras.

**4.** "False designation of origin" violations are defined geographically by the statute. Liability for such a violation may be established "by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated...." For exam-

ple, a Texas citrus producer who places Florida citrus labels on his oranges and distributes them in interstate commerce could be subject only to suit by a Florida citrus producer for false designation of origin under section 43(a). *See Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 700 (5th Cir.1981), *cert. denied* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).

plaintiff must establish that (1) its trade dress is entitled to trademark protection and (2) its protected trade dress was exploited by the defendant. Trade dress—the physical details and designs used on a product as well as its packaging—may be protected as a common law trademark if such dressing is distinctive enough to warrant statutory trademark protection or, though not distinctive, has acquired secondary meaning in the minds of consumers as designating the particular producer of the product. In other words, if the trade dress satisfies the general purpose of trademarks, *i.e.* designates the product as a product of a particular manufacturer, through either the trade dress's distinctiveness or secondary meaning, the trade dress should be accorded protection as a common law trademark. *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 608–09 (7th Cir.1986); *W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334, 337 (7th Cir.1985).

■ The trade dress of a product can include such features as the color, color combinations, texture, shape, size, design and graphics on the product or its packaging. *See LeSportsac, Inc. v. K–Mart Corp.*, 754 F.2d 71, 75 (2nd Cir.1985). Simply put, the trade dress is the form which a producer uses to present his product to the market.

■ To establish a violation of section 43(a) Keystone must prove initially that it has a protectable trade dress, *Blau Plumbing, supra,* at 610, in that its trade dress is distinctive or has acquired secondary meaning in consumers' minds. *Vaughan Manufacturing Co. v. Brikam International, Inc.*, 814 F.2d 346, 348 (7th Cir.1987). Only after it has determined whether the alleged Le Clic trade dress is protectable does the court reach the question of whether the similarities between Keystone's Le Clic cameras and Ansco's cameras are likely to cause confusion. *Blau Plumbing, supra,* at 610. The functionality of the alleged trade dress is a defense to a suit brought under section 43(a). *Vaughan Manufac-*

*turing, supra,* at 349; *W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334, 338 (7th Cir. 1985).

Based upon the evidence adduced at the preliminary injunction hearing and considering the submissions of the parties, the court must conclude that Keystone failed to establish that it is likely to succeed on the merits of its trade dress infringement claim.

1. *The Claimed Trade Dress.*

In its complaint Keystone described its claimed trade dress

> to include unusual contrasting color combinations of bold colors (*e.g.*, sunflower yellow, dove gray, imperial purple, hot pink, mint green, taupe, turquoise and white), and color placement, a distinctive dot pattern, a unique shutter post, and other appearance features which are all unique to the Le Clic camera line.

(Complaint, ¶ 8).

Notable is the fact that not all the cameras in the Le Clic line bear the alleged Le Clic trade dress.[5] Notable also is the fact that the colors which Keystone alleges as examples of the colors used in the Le Clic trade dress, "sunflower yellow, dove gray, imperial purple, mint green, taupe, turquoise and white," are just that—examples. Keystone from the inception of the Le Clic line has intended and still intends to change the various colors of its alleged Le Clic trade dress to maintain "fresh" appeal to the targeted youthful consumer. Keystone's president, Mr. Auerbach, testified: "[W]e will change our colors on our cameras to freshen up our line in order to sell more cameras." (Tr. 157). Indeed, Keystone's 10–K report for the year ending December 31, 1986 stated: "The company intends to keep the Le Clic line current by introducing new colors, color combinations and designs in anticipation of and in response to changing consumer preferences." (Df. Ex. 12, p. 5; Tr. 158). Moreover, "It [Keystone] will also discontinue colors, color combinations and designs [of its Le Clic

---

**5.** For example, the 35 mm Le Clic camera does not bear "bold" colors. It bears subdued colors and is intended to appeal to more mature con-sumers. In contrast, the Le Clic 110 and disc cameras bear bold colors and are targeted at the youthful consumer.

line] when they are no longer current." (Df. Ex. 12, p. 5; Tr. 159).

Keystone did not establish at the hearing how quickly it will change the colors of its alleged Le Clic trade dress. But Mr. Auerbach, Keystone's president, testified: "When we first conceived—when I first conceived of Le Clic, I conceived of the product changing colors more rapidly than it would be even possible for me to do...."

If the court granted Keystone the injunctive relief it seeks, i.e. an order that Ansco not use pink, grey, yellow, purple or turquoise in combination, (See Keystone's Mem. Regarding the Framing of an Injunction Against Ansco, p. 3, filed June 8, 1987) it is possible that by the time this case goes to trial, Keystone will have altered or even discontinued the aforementioned colors/color combinations. For example, according to Mr. Auerbach, Keystone is already trying to discontinue the gray Le Clic camera (Pl. Ex. 2) and the yellow Le Clic camera (Pl. Ex. 4) from retail channels. Within approximately two years these cameras will be eliminated from the market. (Tr. 136).

Consequently, the court finds that the actual colors/color combinations used on its Le Clic cameras are simply a response to and reflection of the current youth-fashion fad of bright color combinations. As Keystone recognizes, the actual colors it uses on its cameras will change over time, in accordance with the whimsical fashion tastes of the youthful consumers to whom Keystone is marketing its cameras.

As illustrated by the colors of the various products shown in the youth-oriented magazines introduced at the hearing by Ansco (Df. Exs. 120–138), the colors utilized on the Le Clic 110 and disc cameras are currently popular and fashionable. Since fashion trends come and go, however, next year other colors and color combinations may be "in" and, according to Keystone's president as well as Keystone's 10–K, the Le Clic colors and color combinations will change accordingly.

By way of background, the Le Clic line of cameras was conceived by Mark Auerbach, President and CEO of Keystone, in October of 1985. Mr. Auerbach believed that to become acceptable to the youth market, the traditional black camera had to give way to an "anti-camera." This anti-camera would be more of a fashion statement than an ordinary functional photo-taking instrument. In Mr. Auerbach's view, bold, vibrant, contrasting colors were in fashion among youth at the time LeClic was conceived. Mr. Auerbach got the idea of using bold, multiple, contrasting colors from the fashion tastes of his daughter, whose tastes were reflective of the trend in the youth fashion industry. He cited the vivid, contrasting multicolors in use by Swatch watches and by Bennetton clothing as the initial source for his contrasting color concept.

Mr. Auerbach's testimony points out the significant weakness in plaintiff's trade dress claim: the Le Clic "look" is nothing more than a reflection of the fashion trends taking place generally in the marketplace of youthful consumers.

■ While the evidence shows that the idea of colored cameras (Pl. Ex. 25, 26; Df. Exs. 94–97), even multicolored cameras (Df. Exs. 92, 93, 86) was not new, the idea of using trendy fashion colors on cameras was, as even defendants admit, a unique idea. But Keystone did not invent this idea. Keystone merely appropriated that idea from other non-camera products in the marketplace. Without question, Keystone was the first to incorporate the youthful multicolored look in cameras. Being the first in an industry to adopt an existing fashion trend does not, however, create a common-law right to the exclusive use of that trend within that industry.

After bucking resistance within his own company, Mr. Auerbach obtained camera prototypes which incorporated his multicolor concept. Mr. Auerbach named the cameras that resulted in Le Clic. By December 1985, design refinements and artwork were completed and the Le Clic cameras were ready for production.

The first Le Clic cameras were produced in the disc camera format only. The original Le Clic line consisted of four disc cam-

eras (Pl. Exs. 2–5) which had brightly colored, shiny fronts contrasted with two-tone gray backs and additional color elements. The gray Le Clic disc camera (Pl. Ex. 2) had a gray front, matching gray carrying cord and gray film advance; a blue shutter button and cord-knob accents; a white dot pattern; a yellow flash on/off switch and back release lever; and purple and red graphics. The pink Le Clic disc camera (Pl. Ex. 3) had a pink front and a matching pink carrying cord; a turquoise shutter button and cord-knob accents; a purple film advance and dot pattern; a yellow flash on/off switch and back release lever; and white and yellow graphics. The yellow Le Clic disc camera (Pl. Ex. 4) had a yellow front and matching yellow carrying cord; a blue shutter button and cord accents; a green film advance and dot pattern; a yellow flash on/off switch and back release lever; and red graphics. The purple Le Clic disc camera (Pl. Ex. 5) had a purple front and matching purple carrying cord; a red shutter button and cord accents; a yellow film advance, flash on/off switch and back release lever; a white dot pattern; and yellow, white and red graphics. The aforementioned graphics consist of (1) large lettering on the camera face which spell the name "Le Clic" and (2) a fanciful arrow head design pointing towards the lens hole on the camera face.

The four Le Clic disc cameras were introduced to the industry in February 1986 at the Photo Marketing Association ("PMA") Show in Las Vegas. At that PMA show, the cameras were greeted with an enthusiastic response. Following the show and throughout the Spring and Summer numerous articles were written in a variety of publications about the Le Clic cameras. Full scale shipments of the four disc cameras to retailers began in mid-April 1986. (*See also* Df. Ex. 12 at p. 5).

The Le Clic line was expanded to include cameras in the 110 format in November 1986. (Pl. Exs. 17–20). The 110 format line also consisted of four designs. The gray Le Clic 110 camera (Pl. Ex. 17) had a

gray camera housing and matching carrying cord; a slightly lighter shaded gray on the front and back; a blue shutter button, film advance, battery cover, and cord accents; a yellow shutter lock and flash switch; pink and white graphics; raised Le Clic lettering in pink on the front and a raised arrow head design on the top. The pink Le Clic 110 camera (Pl. Ex. 19) had a pink camera housing and matching carrying cord; a purple front and back; a turquoise shutter button, film advance, battery cover and cord accents; a yellow shutter lock and flash on/off switch; white and turquoise graphics; raised Le Clic lettering in yellow on the front of the camera and a raised arrow head design on the top. The yellow Le Clic 110 camera (Pl. Ex. 18) had a yellow camera housing and matching carrying cord; a mint green front and back; a blue shutter button, film advance, battery cover and cord accents; a yellow shutter lock and flash switch; white and blue graphics; raised Le Clic lettering in yellow on the front and a raised arrow head design on the top. The purple Le Clic 110 camera (Pl. Ex. 20) had a purple camera housing and matching carrying cord; a yellow front and back; a red shutter button, film advance, battery cover and cord accents; a yellow shutter lock and film switch; red and white graphics; raised Le Clic lettering in red on the front and a raised arrow head design on the top. The aforementioned graphics consist of the name Le Clic spelled out in large letters on the top of the camera in a two-tone shadow print.

Keystone introduced a camera using the "Le Clic" trademark in the 35 mm format in late 1986. The 35 mm camera used more subdued colors than the colors used on the disc or 110 Le Clic. (Df. Exs. 8 and 37).[6] According to Mr. Auerbach, the 35 mm camera caters to a more mature consumer than do the disc and 110 cameras, hence the use of more subdued, less trendy colors.

---

**6.** The Le Clic trade dress of Keystone's 35 mm Le Clic cameras is not alleged to have been infringed by the defendants. Therefore the Le Clic 35 mm trade dress is not in dispute in this case.

In May 1986 the first Le Clic television commercials which specifically featured the contrasting color combinations of the Le Clic cameras were aired. For the year 1986, the Le Clic camera line was advertised on over 300 network and cable television spots, reaching 146 million households. The Le Clic line was featured nine times in national magazines having a circulation of 15 million readers. Since the introduction of the Le Clic line, through the first five months of 1987, Keystone has spent $3.4 million on advertising, promotion and marketing of its Le Clic cameras. This expenditure resulted in the sale of more than 500,000 Le Clic cameras in 1986. Most of the Le Clic sales were of the disc camera. Keystone's total Le Clic camera sales volume in 1986 was approximately $10,000,000. During the first five months of 1987 Keystone sold approximately 340,000 Le Clic cameras in the United States.

Defendant Ansco, in early 1987, introduced its line of color-contrasting cameras. The Ansco camera line came in three formats: 35 mm, 110 and mini 110. The 35 mm and 110 cameras were called "Pix" cameras. The mini 110 was called the "Pixie." The 35 mm camera came in two designs. The raspberry[7] colored Pix camera (Df. Ex. 91) had a raspberry front, a two tone gray back (the dark gray being noticeably lighter than the dark gray used by Keystone on their disc Le Clic's); a purple shutter button and lens cover; a yellow flash on/off switch and film rewind mechanism; a black film advance, film speed select lever, rewind handle, battery cover and rewind release button and housing; purple and white graphics; and an attached purple spring-like ("pig-tail") carrying cord with a yellow clip on the end. The gray Pix 35 mm camera (Pl. Ex. 32) had a light gray front and back; an almost indistinguishable darker gray on the midsector of the camera housing; a coral shutter button; a yellow flash on/off switch; a purple lens cover and rewind mechanism; a

black film advance, film speed select lever, rewind handle, battery cover and rewind release button and housing; purple and white graphics; and an attached purple spring-like ("pig-tail") carrying cord with a yellow clip on the end. The aforementioned graphics consist of the words "Pix" and "Ansco" written out on the front of the cameras: the word "Pix" is on the top of the camera and the word "Ansco" is on the back of the camera. All of the lettering is in white. There is also a purple wavy line design on the front, top, side and rear of the camera.

The wavy design was not originally incorporated in the Ansco cameras. The first Ansco cameras used, along with other graphics, a dot design similar to that used on the Le Clic cameras. Ansco agreed early on to remove the dot design from their cameras. Ansco has since employed a wavy line design.

The Pix 110 cameras came in two color combinations as well. The raspberry Pix 110 camera (Pl. Ex. 33) had a raspberry colored front and portion of the camera back; a pink top and portion of the camera back along with gray on the bottom, top and side of the camera housing; a yellow film advance, shutter button and flash on/off switch; and an attached purple spring-like ("pig-tail") carrying cord with a yellow clip on the end. The graphics included wavy coral lines and the word Pix on the front of the camera; purple wavy lines and the word Ansco in purple on the top along with large lettering of the word Pix in white; the bottom had the same design as the top; and the back of the camera had the word Ansco written in purple. The turquoise Pix 110 camera (Pl. Ex. 34) had a turquoise front and portion of the camera back; a light two-tone gray on the top, bottom, side and back of the camera; a yellow film advance and shutter button and flash on/off switch; and an attached turquoise spring-like ("pig-tail") carrying cord with a matching colored clip on the end.

7. The raspberry Ansco camera, which was referred to by counsel as "pink" or "hot pink," has more of a reddish tinge than the "pink" Le Clic camera. Defendant Ansco's president William Heuer, and design expert, Hari Matsuda, referred to the color of this camera as "raspberry" as opposed to pink. The court agrees that the color of this camera is appropriately characterized as raspberry.

The same purple and white graphic design of the raspberry 110 Pix is incorporated on this camera, except that the wavy lines on the camera front are purple, not coral.

The Pixie mini 110 camera comes in only one design (Pl. Ex. 35). It has a purple top and sides with a gray back, bottom and portion of the front; a yellow shutter button, a black film advance; coral wavy lines and the word Pixie on the front of the camera; white wavy lines and the word Pixie in large lettering on the top; the word Ansco written in white on the back; and an attached purple spring-like ("pigtail") carrying cord with a yellow clip on the end.

As mentioned earlier, Keystone's primary allegation is that these Ansco cameras (Pl. Exs. 33, 34, 35) infringe upon the Le Clic "look." Keystone does not object to the shape of the individual cameras. Keystone instead asks this court to consider the "overall appearance" of the Keystone Le Clic trade dress when compared to Ansco products.

Before analyzing secondary meaning, confusion and functionality, this court must, under *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604 (7th Cir.1986), pause to consider whether Keystone has a protectable trade dress for its cameras which bear clashing, contrasting, multiple color combinations with a distinctive dot pattern. (*See* Pl. Exs. 2–5).

Plaintiff has cited no case where such a broadly defined trade dress was accorded protection. More fundamentally, plaintiff has cited no case in which a combination of unspecified non-blending colors was given trade dress protection; yet that is what plaintiff seeks by its motion. In the published appellate cases in which a color-based trade dress has been found protectable, the trade dress was specifically defined as including the particular colors contained in the trade dress. *See, e.g., Vaughan Mfg. Co. v. Brikam International, Inc.*, 814 F.2d 346, 350 (7th Cir.1987); *Ambrit, Inc. v. Kraft, Inc.*, 805 F.2d 974 (11th Cir. 1986); *In re Owens-Corning Fiberglass Corp.*, 774 F.2d 1116, 1121 (Fed.Cir.1985);

*Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78 (3rd Cir.1982).

As this case stands, plaintiff's claimed trade dress does not have a concrete, color-definite appearance. Absent a specifically defined, color-definite, and *stable* visual appearance, an alleged trade dress cannot receive protection. To hold otherwise and grant plaintiff trade dress protection for combinations of unspecified contrasting colors would allow the plaintiff to monopolize all combinations of contrasting colors. The court therefore holds that Keystone's alleged trade dress is not protectable. The court need not go further, but will do so to aid the parties.

### 2. *Functionality.*

"Functionality is a traditional defense in the common law of unfair competition to a suit for trademark infringement." *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 338 (7th Cir.1985). It is also a defense to a suit under section 43(a) of the Lanham Act. *Id.*

A "product feature is functional if it is essential to the use or purpose of the article." *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 102 S.Ct. 2182, 2187, 72 L.Ed.2d 606 (1982). Or, as the Seventh Circuit recently stated, a feature is functional if it is one that "competitors would find necessary to incorporate into their product in order to compete effectively." *Vaughan Mfg. Co. v. Brikam Intern., Inc.*, 814 F.2d 346, 349 (7th Cir.1987). Phrased differently, a feature is considered non-functional if it serves no purpose other than identification of the product's source. *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 81 (3rd Cir.1982).

Considering the individual cameras presented in evidence, the court must conclude that there is a high degree of functionality to the use of popular contrasting colors on the shutter buttons, shutter locks, lens cover mechanisms, film advancers, back release levers and flash on/off switches. By using contrasting colors on these camera features, the manufacturer assists the consumer in its operation.

Moreover, Ansco's choice of contrasting colors as to these particular features does not correspond to Keystone's choice of colors, except for the flash on/off switch, for which both parties used yellow. Because the contrasting colors of these operational mechanisms help the inexperienced user to operate the camera, Ansco would find it necessary for effective competition to incorporate these color-contrasted mechanisms into their cameras. Keystone cannot, therefore, include these color-contrasted mechanisms in their trade dress claim.

Plaintiff's claim raises a broader functionality problem. Plaintiff attempts to monopolize as its trade dress the entire field of bold, popular contrasting colors. Although colors are not necessarily so extremely scarce that they should never be accorded trademark protection, plaintiff's alleged trade dress consumes so much of the rainbow of available colors that trademark protection must be denied. Moreover, the use of clashing, multiple, popular colors is so widespread in the youth marketplace (on products ranging from clothing to appliances) that such usage has become almost a "generic" feature appealing to the youth of this era. (*See, e.g.* Df. Exs. 120–138). The court is not denying trade dress protection under some theory of "aesthetic functionality," but rather is recognizing that the generic nature of the claimed trade dress alone precludes protection under the functionality analysis. *See W.T. Rogers v. Keene, supra,* 778 F.2d at 338–40.

In the trademark registration case of *In re Owens-Corning Fiberglass Corp.,* 774 F.2d 1116, 1121 (Fed.Cir.1985) the functionality of color was tested by considering: "(1) whether a particular design yields a utilitarian function advantage, (2) whether alternative designs are available to avoid hindering competition, and (3) whether the design achieves economies in manufacturing or use." Applying these factors to the facts in this case, this court concludes that the alleged trade dress is functional.

First, as discussed earlier, certain elements of the claimed trade dress serve functional purposes by highlighting important operational mechanisms, thereby assisting in the use of the camera.

Second, unlike *Owens-Corning,* Keystone does not seek to preserve a single color or a single arbitrary color arrangement. If Keystone did so, it would leave competitors reasonably competitive color alternatives. Keystone, however, by making the broad trade dress claim it has made, is attempting to insulate itself from fair competition in the youth-oriented market. The trademark laws were not designed to insulate companies from legitimate competition in the marketplace. If plaintiff were granted its desired relief, competition would surely by hindered.

In sum, because the alleged Le Clic trade dress is functional, Keystone could not succeed on the merits of its trade dress claims.

### 3. *Secondary Meaning.*

 Secondary meaning describes the association that consumers make between a particular product and the producer or source of that product. Plaintiff must establish secondary meaning in this case because the alleged trade dress is not "inherently distinct." Plaintiff apparently concedes this point, as its proffer and legal arguments are directed at the establishment of secondary meaning.[8] Therefore, for Keystone to succeed on the merits, it must establish that the Le Clic "look" has become identified by consumers with Keystone (the producer) over time. *Vaughan Mfg. Co. v. Brikam International, Inc.,* 814 F.2d 346, 348 (7th Cir.1987).

 Keystone claims that consumers who have seen its cameras (Pl. Exs. 2–5 and 17–20) or have seen the advertising and publicity relating thereto make an association between this "look" and Keystone (or at least a single anonymous producer). The court has difficulty with this theory. The Le Clic "look," by Keystone's own

---

**8.** Nevertheless, the court specifically finds that the trade dress is not "inherently distinct," nor does it serve as an established identifying mark.

admissions, is ultimately not directed at designating the producer of the cameras. The "look" is instead directed at satisfying consumer tastes and demands, particularly currently popular youthful fashion tastes. That is apparently why Keystone intends for the colors, graphics and other adornments of the Le Clic "look" to change in response to changes in consumer styles and tastes. Keystone cannot establish a consumer association between this ever-evolving "look" (in its incalculable variety of appearances) and Keystone.

Aside from these difficulties, Keystone needs to establish that a consumer connection between itself and its Le Clic cameras developed in a period of, at most, 14 months. While the first cameras were produced by December 1985, full scale shipment did not begin until April 1986. Advertising did not start until May of 1986. Print advertisements apparently did not start until August 1986. Moreover, most of the articles about the Le Clic cameras stated that they would be available in the Fall of 1986. Given mass marketing techniques, no *per se* rule can be set as to the amount of time necessary to establish "secondary meaning." In this case, however, plaintiff did not meet its burden of establishing secondary meaning.

■ The court can consider not only the length and manner of use of the trade dress, but also the amount and manner of advertising, the volume of sales, direct consumer testimony and consumer surveys. *Gimix v. JS & A Group, Inc.,* 699 F.2d 901, 907 (7th Cir.1983). Given the particular facts of this case, the use of the trade dress was so short-lived that secondary meaning could not have been established. *See Gimix,* 699 F.2d at 907 (five year's use of a wordmark is "so brief as to cast serious doubt upon the very possibility of having established a strong secondary meaning"). This court agrees with the recognized principle that a design takes longer than a wordmark to acquire secondary meaning. *See Sunbeam Corp. v. Equity Industries, Inc.,* 635 F.Supp. 625, 630 (E.D. Va.1986), *aff'd,* 811 F.2d 1505 (4th Cir.1987) (per curiam). Keystone must establish that

consumers identified its broadly defined trade dress with a single source or producer. The evidence simply did not and could not show such a consumer identification.

The evidence as to the amount and manner of advertising and the sales volume of the Le Clic camera is unpersuasive. Keystone presented its advertising evidence partially without a context. The circulation and household numbers are only minimally useful in identifying how many different people (or what percentage of the population) actually were exposed to the advertisements. And Keystone's evidence of Le Clic sales and Le Clic advertising expenditures is weaker than that presented in *Sunbeam.* As in *Sunbeam,* the monopolistic position of Keystone and the novelty of its Le Clic concept combining popular colors can explain much of Keystone's sales success.

Keystone did not present direct consumer testimony as to secondary meaning. Keystone's president testified, however, that he knew of no consumer who confused Keystone's products with Ansco's products. In fact, he testified that consumers have not attempted to return a single one of defendants' alleged infringing cameras to Keystone. Neither did Keystone present a secondary meaning survey.

■ Keystone relies heavily on its evidence that Ansco copied the Le Clic trade dress. But evidence of trade dress duplication alone does not establish secondary meaning; it only serves as probative evidence of secondary meaning. *Vaughan Mfg. Co., supra,* 814 F.2d at 349. In addition to presenting copying evidence, plaintiff must produce evidence tending to show the trade dress has acquired secondary meaning. As noted above, plaintiff did not present persuasive evidence—independent of what it claims is evidence of copying—that supports a finding of secondary meaning as to Keystone's alleged Le Clic trade dress.

Moreover, Keystone's evidence was insufficient to establish that Ansco deliberately copied Keystone's trade dress. As the court discusses next in the "confusion" analysis, the particular Keystone and An-

sco cameras put into evidence are noticeably different in overall appearance. Particular features of the camera (like the packaging) are also distinct. Ansco employed its own design consultant, Mr. Hari Matsuda, to develop its line of fashion cameras. While the Ansco designer, Mr. Matsuda, had certain Le Clic camera samples in his possession, this fact cuts both ways. One could infer that the Ansco designer used the Le Clic cameras either to produce near duplicates or to create distinctive products. The fact that the Le Clic and Ansco cameras are easily distinguishable adds credibility to the latter interpretation.

In essence, plaintiff Keystone has failed to establish secondary meaning for its claimed Le Clic trade dress.

### 4. *Likelihood of Confusion.*

In assessing the likelihood of confusion, the court considered both the overall appearance of the Le Clic trade dress and the dress reflected in the specific Le Clic and Ansco products placed in evidence. The court carefully examined both the individual features of the cameras and their total, overall image.

■■■ After due consideration, the court does not find any likelihood of confusion between Keystone's and Ansco's cameras. The overall appearance of defendants' cameras is distinct from that of plaintiff's; it is not likely to cause confusion. The court bases this conclusion on, among other things, the fact that Ansco presented its "Pix" or "Pixie" name prominently on its cameras, used different shades of color, different color combinations and different color placements on its cameras from those used by plaintiff. Ansco's removal of the dot design from its camera as well as its utilization of the unique graphic design presently found on Ansco's cameras also makes it less likely that consumers would be confused as to the source of the Ansco cameras. *See Blue Coral, Inc. v. Turtle Wax, Inc.,* 664 F.Supp. 1153, —— (N.D.Ill. 1987).

This case is easily distinguishable from *Vaughan Mfg. Co. v. Brikam International, Inc.,* 814 F.2d 346 (7th Cir.1987) and *Canon U.S.A., Inc. v. Saber Sales Corp.,* 220 U.S.P.Q. 1003 (E.D.N.Y.1983) in which the defendants' product configurations and color placements were nearly identical to those used by plaintiffs.

Although Keystone does not allege that the shape and configuration of Ansco's cameras play a role in the alleged trade dress infringement, the court may consider the fact that aside from the color elements, Ansco's 110 cameras, including the mini 110, are different in shape and appearance from Keystone's 110.

It is also important to note that this suit involves different camera formats. Keystone sells 110 and disc cameras in the fashion accessory style, while Ansco sells 35 mm, 110 and mini 110's. These differing formats further tend to make consumer confusion unlikely. For example, Keystone presented no evidence that a consumer who wished to purchase a disc camera could be so confused by defendants' trade dress that he would buy a 35 mm camera. Nor was there evidence that a camera's format was generally irrelevant to a consumer purchasing decision.

The carrying cords which are attached to the Keystone and Ansco cameras are another visibly distinguishing characteristic. Plaintiff's cameras use a straight rope cord while defendants use a plastic spring, telephone-type "pig-tail" cord. On all of plaintiff's cameras the cords are color-coordinated with the face of the camera. The same is not true for the defendants' cords, which apparently come in only two colors. Moreover, Ansco's unique telephone-type cord is clearly visible in the display packaging of the Ansco cameras.

The packaging itself is yet another visual feature which distinguishes Keystone cameras from Ansco cameras. While both of the parties use clear clam-shell blister packaging,[9] the cardboard graphics inserts (which serve as background for the cameras) are easily distinguishable. Keystone uses a vivid and fanciful cardboard insert

---

**9.** Plaintiff specifically rejected any claim to pro- tection of the clear blister packaging.

with rather elaborate graphic designs. Ansco, on the other hand, use a predominantly gray, nondescript cardboard insert with a simple square grid graphic design. (*See* Df. Exs. 1, 14, 21, 90, 91 and 107.)

The placement of the cameras within the two producers' packages is different, as is the shape of the package itself. In addition, Keystone does not display its attached carrying cord on the front of the package; Ansco does. Keystone also provides a "designer carrying pouch" for the disc Le Clic cameras; Ansco does not. Purchasing consumers will see the cameras primarily in their packaging. It would be nearly impossible to confuse the products of Keystone and Ansco as they are packaged.

The labeling of the two types of cameras also distinguishes them. Keystone cameras are called "Le Clic." Ansco's cameras are called "Pix" and "Pixie." [10] Ansco prominently displays the names "Ansco" and "Pix" on both the cameras and the packaging. The bold Le Clic lettering, of course, is one of the most prominent features of Keystone's cameras. Le Clic also appears in giant lettering on the packaging. (*See, e.g.* Df. Ex. 1 where the Le Clic lettering is two inches high on a package only ten inches long.) Such conspicuous labeling is helpful in avoiding confusion. *Sunbeam Corp. v. Equity Securities Corp.*, 635 F.Supp. at 633.

There was no evidence of actual consumer confusion, although plaintiff did present expert testimony concerning a "confusion" survey. The court will not comment extensively on this survey, except to note that it was fraught with errors and inconsistencies. Problems with the confusion survey include: the use of different stimuli in different test locations; the blockage of the carrying cords; the change in control cameras (Rokinon) at different test sites; the failure to present the cameras in their appropriate point of sale packaging; and the failure to present the total camera (backs and sides) to survey respondents.

For the foregoing reasons, the court must conclude that plaintiff cannot establish a likelihood of confusion between Keystone's and Ansco's cameras.

Because Keystone has not established any likelihood of success on the merits of its claim, the court need not consider the other factors (*i.e.*, the relative harms and the public interest) in the preliminary injunction formula.

CONCLUSION

Based upon the above findings of fact and conclusions of law, the court holds that plaintiff has not shown that it is likely to succeed on the merits of its federal and related state law claims. Therefore, plaintiff's motion for a preliminary injunction is DENIED.

10. Due to a complete lack of proof the court rejects outright any claim Keystone may have made regarding Ansco's use of the names "Pix" and "Pixie."