**GASSER CHAIR COMPANY, INC. and George Gasser, Plaintiffs,**

v.

**INFANTI CHAIR MANUFACTURING CORP. and Vittorio Infanti, Defendants.**

No. CV–88–3931.

United States District Court, E.D. New York.

June 28, 1996.

**204**

Charles P. Kennedy, Daniel H. Bobis, Keith E. Gilman, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, Ira Cohen, Hart, Baxley, Daniels & Holton, New York City, for Plaintiffs Gasser Chair Company, Inc. and George Gasser.

Anthony J. Casella, Casella & Hespos, New York City, Thomas M. Gibson, Timothy X. Gibson, Hedman, Gibson & Costigan, P.C., New York City, for Defendants Infanti Chair Manufacturing Corp. and Vittorio Infanti.

### MEMORANDUM AND ORDER

GLASSER, District Judge.

The plaintiffs Gasser Chair Company, Inc. and George Gasser, individually (collectively "Gasser" or the "plaintiff") commenced this action against the defendants Infanti Chair Manufacturing Corp. and Vittorio Infanti, individually (collectively "Infanti" or the "defendant") for infringement of U.S. Patent No. 4,106,739 ("the '739 patent") and for violation of its trade dress rights in the overall appearance of its chairs under § 43(a) of the Lanham Act and at common law. The case was tried to the court without a jury over a period of seven days during which the court heard the testimony of numerous witnesses and received and considered exhibits which can fairly be characterized as voluminous. Based upon the testimony of the witnesses and the assessment of their credibility together with a consideration of the exhibits, I make the following findings of fact and the conclusions of law those facts require me to reach.

The history and development of the Gasser Chair Company was recounted by George Gasser, its Chief Executive Officer. In 1946, George and his two brothers, Roger and Louis, living in Youngstown, Ohio, embarked upon the chair business when first asked to build a kitchen set and then a chair, both of which were successfully made and accepted by the customer. From that modest beginning they began to build chairs in 1947 and a company which presently employs 150–160 persons, has its main factory in Youngstown, Ohio, assembly plants in Seattle, Washington, Reno, Nevada and Georgia and sells its product world-wide to a market consisting primarily of restaurants, hotels, motels, clubs (civilian and military) and gaming casinos. (Tr. at 214–16). His testimony traced the evolution of the chair which is the subject of this action, beginning with a desire to build and market a chair that was different from the stacking chairs which were then known to the industry by enhancing his chair with what he described as character and a design that would give it its own recognition. (Tr. at 218). That chair, referred to as the Gasser 8800 series and in evidence as Px 64, was different from anything else then on the market and in time became identified with Gasser. (Tr. at 219).

Mr. Gasser later became aware that in addition to design and character, it was necessary to build a chair that would withstand the insult that the sides, perimeters and backing of stacking chairs endured by being continuously stacked and unstacked and by being constantly bumped into walls, tables and other chairs. That constant abuse inevitably caused the upholstered fabric which covered the sides, perimeters and backing of such chairs to become cut, frayed and damaged in other ways. (Tr. at 220–21). Upholstered chairs and steel-framed chairs were the only kinds known to the industry at the time. The steel-framed chairs, although not subject to the shabbiness to which upholstered chairs succumbed, were less than satisfactory in that they caused damage to wall paper and tables by constant contact with them. The need to solve those problems, led by trial and error, to the chair with the protective edge. The process of experimentation began with heavy welts, then on to large nails and then to plastic extrusions of different types and shapes until a chair with a protective edge which was attractive and functional was finally developed and first produced in 1976 for the Ogden Food Service Corp. which ordered 700 of them for intended use in the Superdome in New Orleans. Shortly thereafter, Gasser chairs with the protective edge were exhibited at a trade show in Chicago and at one in New York and offered for sale. The chairs were enthusiastically received by the relevant markets. On August 15, 1978 patent number 4,106,739

(the '739 patent) was granted to George Gasser.

The advantages of the protective edge were described in Mr. Gasser's patent application as follows in column 2, line 66, to column 3, line 19 (Px 1):

The bumper edge member in addition to providing a protective edge to the perimeter surface of the chair so as to guard against upholstery damage, provides a soft and appealing decor to outline the chair and outline its contours. It additionally insures a soft contact with a table edge where the chair comes in contact with the same. When formed of the preferable material as specified hereinbefore, it provides a non-marking surface which will prevent damage to walls and decorative panels and it provides a pleasant yielding edge treatment for the chair with respect to handling by a person seated therein. In addition to the foregoing it will occur to those skilled in the art that the cushion bumper edge member adds considerably to the life of an otherwise vulnerable section of a commercial chair such as those used in a restaurant and additionally it provides an opportunity to carry accent color through the hollow center section if desired as the material from which the bumper edge member is formed may be transparent, translucent or of any color desired.

The claims as stated in the patent are as follows:

I claim

1. A bumper edge member for chairs and the like which have structural portions defining perimeter edges, the edge member comprising:

a continuous resilient member having an elongate body portion and a pair of spaced flanges extending outwardly from said body member, said flanges being located on said body member to receive therebetween a structural portion of a chair;

a first cushioning means defined in said body member, said first cushioning means including a hollow chamber defined in said body member to be located between said flanges in front of an edge of such structural portion;

a second cushioning means defined in said body member to be located between said flanges; and

said second cushioning means being positioned in said body member to be located between a chair structural portion edge and said first cushioning means.

2. The bumper edge member set forth in claim 1 and wherein said hollow chamber is cross sectionally circular.

3. The bumper edge member for chairs set forth in claim 1 and wherein the edge member is formed of a resilient high density resin.

4. The bumper edge member for chairs set forth in claim 1 and wherein the spaced flanges are substantially parallel and are of an overall length substantially equal to the continuous resilient member.

5. The bumper edge member set forth in claim 1 wherein said second cushioning means includes a portion of said body member which is convex in shape relative to said body portion to provide a limited area of contact with respect to a structural portion engaged thereagainst.

6. The bumper edge of claim 1 further including means on said flanges defining guide slots for indicating desirable areas to fasten upholstery material and trim to said resilient member.

\* \* \* \* \* \*

Mark E. Gasser, the Executive Vice President of Gasser Chair Company testified at some length about the plaintiff's business and about the events which led to this litigation.

The introduction of the protective edge set the Gasser chair apart from everything else that was available in the marketplace. The Gasser chairs with the protective edge were distinctive in design and were superior in that they had a considerably longer life span. The value of the Gasser chair was gradually recognized by the industry and approximately 90% of the total sales of the Gasser Chair Company was of its chairs with the protective edge.

Gasser first became aware that its patent was being infringed by Infanti in November of 1978. Following a letter to Mr. Infanti from Gasser's then general counsel request-

ing that he stop infringing, Infanti agreed, in March 1979, that he would cease doing so. (Px 137). (Tr. at 89; 233). Three years later, in 1982, Gasser learned that Infanti was once again offering to sell chairs with the protective edge. In a letter dated April 19, 1982 sent via certified mail, return receipt requested, to Infante (sic) Industries, Gasser's attorney alluded to their 1979 agreement and requested the defendant to cease infringing the Gasser patented protective edge. (Px 139). That letter was returned as undeliverable. (Tr. at 90). As a precautionary matter, another letter, dated May 19, 1982, was sent to Infanti to the same effect. (Px 140). No response to that letter was received. (Tr. at 90). An inquiry regarding Infanti's company was then made of Dun & Bradstreet ("D & B") which reported that they were advised by Betty Infanti (Vittorio's wife) that the company was dissolved. (Px 141). Upon noticing that the advice from Betty Infanti was received by D & B in November, 1981, a second request for information was made of D & B. In a report dated September 14, 1982, D & B indicated that it had learned from information obtained on September 10, 1982 that Infanti had discontinued operations. (Px 142). Based upon those reports, Gasser believed that Infanti was either no longer in business or no longer making chairs. (Tr. at 92).

In 1983, Infanti was once again seen to be exhibiting the infringing chair at a trade show. George Gasser reminded the defendant of their 1979 agreement and that they were once again infringing the patent. Infanti's response was that he no longer felt bound by that agreement because Gasser had disparaged their chair in front of a customer. (Tr. at 233–34). Mr. George Gasser denied any knowledge of such an incident and assured Infanti that he would investigate the matter and if such an incident in fact happened, he would put a stop to it. Mr. Gasser believed that as a result of that conversation, Infanti would resume abiding by their agreement of 1979. (Tr. at 93). A subsequent investigation revealed that a Gasser salesman did what the defendant alleged without the knowledge or approval of Gasser and such an incident was never again repeated.

Infanti did not appear at trade shows in 1984 and 1985, nor were any advertisements by the defendant seen in those years. During that period of time, Mark Gasser testified that he did not see any installation for which Infanti chairs had been purchased and it was honestly believed that the defendant no longer manufactured chairs or was no longer in business. (Tr. at 99–100).

Infanti re-appeared at a trade show in 1986 where they were again offering chairs with a protective edge and when confronted by George Gasser said they had no intention of discontinuing manufacturing those chairs and believed the Gasser patent was invalid. That conversation resulted in the commencement of this action after attempts at a negotiated resolution of the matter failed. (Tr. at 103–06).

The testimony of defendant Vittorio Infanti is revealing and of itself might appropriately be regarded as dispositive of this action, particularly when coupled with the deposition testimony of Betty Jean Infanti, his wife, which was read into the record.

To begin with, Mr. Infanti's asserted justifications for copying the Gasser chair with the protective edge were that he believed the invention was not patentable and that in any event, he had invented it first. As regards his claim that he was the prior inventor of the protective edge, he had sought to support that claim by documents which he admitted were forgeries in that dates were altered by him or at his direction to reflect his prior "invention". (Tr. at 303–37; Px 119–134). In addition to acknowledging the forgeries which were not discovered by the plaintiff until shortly before trial, Mr. Infanti also admitted that he repeatedly testified falsely under oath, when he was deposed; that he sat silently by when two other witnesses were deposed and, to his knowledge, testified falsely; that he sought to suborn the perjury of a deposition witness (Tr. at 331–36) and submitted documents he knew to be false in connection with a motion for summary judgment made earlier in the course of this litigation.

The intentional tampering with the dates on documents which would have been significant in confirming Mr. Infanti as a prior

inventor was corroborated by Betty Jean Infanti, his wife. (Tr. at 276–82).

Those admissions, extracted from Mr. Infanti upon his direct examination by plaintiff's counsel, not only belie his assertion of being a prior inventor, they also belie his assertion that the invention was not patentable in that his efforts to mislead the court and the plaintiff into believing that he was the prior inventor can only be regarded as a tacit recognition by him that the patent was valid. Needless to say, these admissions have caused the court to take an exceedingly dim view of Mr. Infanti's testimony as a whole. *Falsus in uno, falsus in omnibus* has particular applicability to an assessment of his credibility. (*See also* Tr. at 348–50 for his admission that he testified falsely under oath in another proceeding.) The testimony of this witness supports the observation that "the moral efficacy of an oath has long since ceased to be what it once was." VI *Wigmore on Evidence,* (Chadbourne Revision), § 1847. On the other hand, the testimony of Mark, George, Cindy and Gary Gasser belies that pessimistic view. Their testimony was refreshing for its directness, responsiveness and honesty. The court had no doubt of the moral efficacy of the oath they took upon their testimony.

Mr. Infanti admitted that he copies the Gasser chair although he was less than direct as to how he copies it. For example, the deposition testimony of Betty Jean Infanti, received in evidence, was as follows. Tr. at 274, lines 21–24:

Question: Are you aware of any time that Mr. Vittorio Infanti obtained a chair from Gasser Chair Company and took the chair apart?

Answer: Yes.

Continuing on page 275, lines 4–25; page 276 lines 1–10:

Question: When do you recall that occurring?

Answer: It would have to be the first sample that was brought to us.

Question: That's what you've testified to, the one from 1975 or whatever?

Answer: Yeah—not that early, no, it would be around '76.

Question: Did that occur on more than one occasion?

Answer: Yes.

Question: Can you recall how many occasions that occurred?

Answer: Oh, when someone would bring us a sample chair and if we wanted to know something about it, we would just take it apart as I'm sure they did to ours and companies are doing with ours now.

Question: Are you saying it occurred regularly over the time that you were at Infanti?

Answer: Yes.

Question: I'm speaking now just with reference to Gasser chairs.

Answer: Yes.

\* \* \* \* \* \*

Question: Were there any Gasser chairs that were kept at Infanti not taken apart but actually kept there?

Answer: Yes.

Next is page 85 line 16.

Question: Do you recall Mr. Infanti ever taking a plastic edge off of a Gasser chair to take a look at which (sic) it looked like?

Answer: Yes.

Question: When do you recall him doing that?

Answer: It probably goes back to 1977.

By way of contrast, the testimony of Mr. Infanti was as follows when he was asked whether he copied the Gasser chair:

Q. And you copied it?

A. Yes.

Q. Did you tack (sic) it apart?

A. I don't recall. Maybe I did.

Q. What you made had the same pieces and they looked the same, is that right?

A. What do you mean the pieces look the same.

Q. Had the same components?

A. Yes.

Q. Same shape of back?

A. Yes.

Q. Same seat?

A. Same seat.

Q. Same legs? Backrest or plate connected in the same way?

A. Yes.

Q. When you got all done, what you had looked like the Gasser 8800 chair, is that right?

A. That's correct.

Tr. at 359, lines 12–25 and 360, lines 1–5.

Mr. Infanti also testified that many people have asked him to make exactly the same chair as Gasser makes and in 99% of the time he does and he does so in large quantities ranging from 500 to 2,000. (Tr. at 362, 364). Beyond that, an Infanti invoice received in evidence as Px 197, bills for "Dining Chairs similar to Gasser E990" and "Barstools similar to Gasser–IX." Px 217 was an order for seats to be exactly like Gasser's, attaching pictures from the Gasser catalogue of the seats requested. *See also* Px 218, 199, and 258. The latter exhibit is a letter from Infanti to a customer which reads in relevant part: "The following are our full line of Infanti series 2000 stack chairs. We can copy the Gasser SE–8809 if this is what you prefer." In another document in that exhibit is an order for "Gasser style" chairs. That exhibit is replete with documents to similar effect—customers requesting Infanti to make Gasser style chairs. *See also* Px 261, 279, 183 and Tr. at 368–78. In addition to additional testimony by Mr. Infanti appearing at pages 664–66 of the transcript, further references to other portions of the record convincingly establishing that Infanti copied the Gasser Chair with the patented protective edge would be cumulative.

I turn to the testimony relating to the confusion extant between the Gasser chair and the Infanti chair. The discussion above of the evidence of orders of Infanti chairs which request that they be similar to the Gasser chairs manifests confusion if that term is understood to mean broadly, as it must, that the "gestalt" of the Infanti chair has the effect of causing a belief that it is a Gasser chair in the eye and mind of the ordinary beholder. A more precise articulation of the law in this regard will be made below. Specific illustrations with which the record abounds will be provided here.

Mark Gasser testified about an incident in which the sales manager for a Gasser distributor offered to retrieve Gasser chairs from Harrah's casino in New Orleans and bring them to Las Vegas. He later discovered that he mistakenly removed Infanti chairs believing they were Gasser's. (Tr. at 58–59).

Casino managers saw the Infanti chair as an alternative to the Gasser chair because it was cheaper and they couldn't tell the difference between them. (Tr. at 78). I might add that Infanti chairs and Gasser chairs were received in evidence and were in the courtroom during the course of the trial and I could not distinguish one from the other. *See also* Tr. at 82. There was evidence that the inferior quality of Infanti chairs was attributed to Gasser. (Tr. at 167–70). On one occasion, Mr. Gasser received a photograph of a hotel ballroom from a sales representative who sold Gasser chairs for more than thirty years, congratulating him on the sale of the chairs depicted in the photograph. The chairs depicted were in fact Infanti's. (Tr. at 171). A Navy Club in Virginia returned a defective chair to Gasser which proved to be Infanti's. (Tr. at 171–72). Customers would request Gasser and Infanti to submit samples before making buying decisions and returned to Gasser both theirs and Infanti's chairs and on occasion just Infanti's chairs. (Tr. at 172). It frequently happened that Gasser customers would comment upon seeing their chairs at catering halls or congratulate Gasser on a nice installation of chairs at a particular facility and in each case the chairs were not Gasser's. (Tr. at 173–74). George Gasser testified to experiences that were of a similar order. (*See* Tr. at 235–36).

The most extensive testimony regarding confusion came from Cindy Gasser, the Director of Sales at Gasser Chair Company who is responsible for all of the sales activities of the company. Specific instances were recounted, including the following: A telephone caller said they had Gasser furniture which was old, abused and needed to be replaced. The "look" of the furniture was the "look" they wanted. The furniture turned out to be Infanti's and not Gasser's. (Tr. at 383). An architect said he saw Gas-

ser's furniture in a country club in Virginia recognizing it to be Gasser's by the look. He was correct. (Tr. at 384). Complaints are received by Gasser from customers who are critical because their defective chairs are not being serviced. The chairs complained of are Infanti's, not Gasser's. (Tr. at 384). At a New York trade show, the general manager of a country club was critical of Gasser because his phone calls reporting defective chairs were not returned. The chairs were Infanti's, not Gasser's. (Tr. at 385). Similar instances were detailed by this witness, who the court found to be completely credible, at pages 386–89 of the transcript. Ms. Gasser testified to the vital importance the protective edge has assumed for its furniture and for its demand in the market as well as the unique look which has become identified with a Gasser chair as the findings previously made, unequivocally prove. (Tr. at 391). She also testified that the sales Gasser lost to Infanti was principally due to a lower price for the Infanti chair. (Tr. at 394–401). That testimony was corroborated by the testimony of Morgan Graham, the Vice President of Construction and Development for Ryan's Family Steak Houses which switched from Gasser chairs to Infanti's principally because of price. (Tr. at 422).

### Patent Infringement

The testimony of Mr. Infanti and the deposition testimony of his wife read into the record, without more, establish beyond cavil that the Gasser patent was infringed. That testimony, confessing as it does to the falsification of documents to support Infanti's claim that he was the prior inventor constitutes, as the court has already observed, a tacit admission of the patent's validity. The validity of the patent was reconfirmed by the Patent Office upon it re-examination at the behest of Infanti who has in all other respects failed to establish the invalidity of that patent by clear and convincing evidence. The burden of proof in that regard rested squarely with him.

■ The implicit admission of validity and the failure to prove its invalidity aside, the infringement of the patent was convincingly established and will now be addressed.

Testifying on behalf of the plaintiff was Mr. Thomas Tolleson who was qualified as an expert in designing chairs. He is the president and owner of an industrial design consulting firm in Charlotte, North Carolina which specializes in the design and development of office furniture, of which chairs constitute a major part. Prior to forming his own company, he was Director of Design for Krueger International, charged with the responsibility for designing chairs; he was Director of Research and Development for Shelby Williams, perhaps the leading manufacturer of chairs, he was the recipient of an award for chair design and has been awarded patents for inventions relating to chairs. He was found to be, quite clearly, a person skilled in the art of chair design. (Tr. at 512–14).

Mr. Tolleson testified that he reviewed the patent, its prosecution history, the chairs (Gasser's and Infanti's) and their respective components. He cut apart Infanti's chairs, examined pieces of extrusion supplied by Infanti and Gasser which he tested manually to see how they function. He mounted the extrusions on the backs of chairs. He compressed Infanti's extrusions and applied loads laterally to them. (Tr. at 515). He related the physical objects to the patent claims.

■ Mr. Tolleson parsed in detail the elements of the first claim of the patent. (Tr. at 517–20). That claim is written in the "means-plus-function" mode and in accordance with 35 U.S.C. § 112 must be "construed to cover the structure described in the specification and equivalents thereof." 755 F.2d at 1574. It must follow that the "second cushioning means" language of Claim One must be read as embracing that portion of the bumper edge with a convex surface and any equivalent shape having an air space between the bumper edge and the edge of the chair. It must also follow that the "second cushioning means" would include a concave or any other surface configuration having an air space between the bumper edge and the edge of the chair. Mr. Tolleson testified to that effect (Tr. at 520–29) and the court is in complete agreement with that conclusion. It follows, therefore, that Infan-

ti's protective edge with a concave surface has, literally, every limitation of Claim One of the '739 patent and literally infringes that claim. It should be noted that giving due regard to the doctrine of claim differentiation, Claim Five cannot be read as a limitation of Claim One which cannot, therefore, be read to require a convex surface for the second cushioning means. *See D.M.I. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir. 1985). The court concludes, based not only on Mr. Tolleson's testimony but also on its own examination of the exhibits, the structure of which was readily apparent, and my reading and interpretation of the claims, that the Infanti extrusion has all the elements of Claim One of the patent.

Mr. Tolleson testified that the Infanti extrusions read literally upon and infringed all the limitations of Claims Two, Three and Four of the '739 patent. (Tr. at 529–31). The Infanti protective edge literally infringes Claim Two because it has a hollow chamber which is cross-sectionally circular; literally infringes Claim Three because it is formed of a resilient high density resin which conforms to this limitation, and literally infringes Claim Four because it has spaced flanges which "are substantially parallel and are of an overall length substantially equivalent to the continuous resilient member." An examination of the exhibits and the court's construction of those claims support Mr. Tolleson's testimony in its entirety.

As to Claim Five, the court is also in complete agreement with Mr. Tolleson that the protective edge on the Infanti and Gasser chairs are equivalent. (Tr. at 533).

The accuracy and validity of Mr. Tolleson's testimony was not disturbed in the least by cross-examination.

As regards the above, due regard is given to *Markman v. Westview Instruments, Inc.*, —— U.S. ——, ——, 116 S.Ct. 1384, 1388, 134 L.Ed.2d 577 (1996) in which the Court declared that "[t]he claim define[s] the scope of a patent grant '... and functions to forbid not only exact copies of the invention, but products that go to the heart of the invention but avoid the literal language of the claim by making a noncritical change.'" The Court went on to hold "that the construction of a patent, including terms of art within its claim, is exclusively within the province of the court." —— U.S. at ——, 116 S.Ct. at 1387. In discharging that responsibility, the court concludes that the claims of the '739 patent covers Infanti's infringing product.

The second witness to address the patented invention was called by the defendant. He was Joseph Truhe, an electrical engineer who, for twenty-eight years was a patent examiner in the Patent and Trademark Office. He conceded that he was not skilled in the art of chair design and conceded that the issue of anticipation of an invention by art should be determined from the view of one skilled in the art. Tr. at 772. The testimony of this witness in its virtual entirety, was an attempt to establish that what was referred to as the Matthews Patent (Dx AE) was prior art which invalidates the patent in issue. The Matthews patent was for a dock piling fender and even a casual examination of that patent's drawings, descriptions of its embodiments and claims compels the conclusion that it could not have anticipated and does not in fact anticipate the patent in suit. The concessions extracted from this witness on cross-examination pertaining to the Matthews patent convincingly buttresses the conclusion the analysis of that patent compels. *See* Tr. at 762–73. This witness was overtly defensive in his responses to cross-examination and given his unsuccessful effort to fit the round peg of the Matthews patent into the square hole of anticipation and his lack of skill in the relevant art, the court gives little credence to his testimony.

■ In the revealing light of the findings of fact regarding the conduct of Vittorio Infanti, namely, the knowing and intentional falsification of documents to reflect that he was the prior inventor; the subornation of perjury of witnesses and his own perjury; and the admitted cloning by him of the plaintiff's chair with the patented protective edge, the court readily finds that Vittorio Infanti is personally liable for inducing the infringement of the plaintiff's patent by the corporate defendant, Infanti Chair Manufacturing Corp. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed.Cir. 1986). Mr. Vittorio Infanti is clearly por-

trayed on the canvas of this record as the moving force behind every phase of the corporation's manufacture, promotion and sales of the infringing chairs.

I have previously commented on the inference, justifiably drawn, of the validity of the '739 patent from Infanti's flagrantly fraudulent effort to establish its invalidity. That would suffice, in this court's view, to establish its validity without resorting to the presumption of validity provided by 35 U.S.C. § 282 and without commenting upon the complete failure by Infanti to bear the heavy burden of establishing by clear and convincing evidence that the '739 patent is not valid. *Al–Site Corp. v. Opti–Ray, Inc.,* 841 F.Supp. 1318 (E.D.N.Y.1993). Nor is it deemed necessary to comment upon the added burden placed upon one who would attack the validity of the patent of "overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The addition of that burden is especially warranted here given the re-affirmation of the validity of the '739 patent upon a re-examination sought and obtained by Infanti and the prior art references submitted by him.

■ Infanti's claim that the '739 patent is invalid pursuant to 35 U.S.C. § 102 for the reason that it was anticipated by prior art is unpersuasive. As has been previously observed, the assertion that the '739 patent was presaged by a dock fender, (the prior art principally relied upon) was very wide of the mark. Repetition of the court's assessment of the credibility of the defendant's expert on this phase of its case would be superfluous.

■ Similarly unpersuasive is any claim that the '739 patent is invalid for obviousness in accordance with 28 U.S.C. § 103. The presumption of validity recognized by 35 U.S.C. § 282 trumps a claim of obviousness unless the patent's detractor can establish by clear and convincing evidence that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The defendant has not presented any evidence which is either clear or convincing to support a claim of obviousness.

■ A conclusion that a patent is invalid on the ground of obviousness is a legal one, arrived at after due consideration given to four factors, namely: (1) the scope and content of the prior art; (2) the differences between the prior art and the patented invention; (3) the level of ordinary skill that was required when the invention was made; and (4) any objective considerations—secondary criteria so called, such as commercial success, the copying of the invention by others, or the filling of an existing need, among others. *See Continental Can Co. USA, Inc. v. Monsanto Company,* 948 F.2d 1264, 1270, 1273 (Fed.Cir.1991); *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566 (Fed. Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The process by which that conclusion is reached was eloquently described in *Panduit* at 1566 as follows:

> With the involved facts determined, the decisionmaker confronts a ghost, i.e., "a person having ordinary skill in the art," not unlike the "reasonable man" and other ghosts in the law. To reach a proper conclusion under § 103, the decisionmaker must step backward in time and into the shoes worn by that "person" when the invention was unknown and just before it was made. In light of all the evidence, the decisionmaker must then determine whether the patent challenger has convincingly established, 35 U.S.C. § 282, that the claimed invention as a whole would have been obvious at that time to that person.

Infanti, the challenger of the patent who has admittedly copied it and profited handsomely from having done it and who perjured himself and suborned the perjury of others to establish himself as the inventor, has not established, convincingly or otherwise, that the Gasser invention was obvious. Were his

copying and perjury not enough, the application of every factor to the facts as found by the court would have driven the court to that conclusion.

Infanti has sought to escape the consequences of his infringement by asserting the defense of laches—that Gasser unduly delayed in bringing this suit. This defense need not detain us long. The defense of laches is an equitable one and is addressed to the discretion of the court to be exercised after considering all the facts and circumstances of the case and weighing the equities of the parties. *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995). There are a number of principles that have become so deeply embedded in equity that they are commonly referred to and quoted as maxims. One that is peculiarly relevant here is that "he who comes into equity must do so with clean hands," more colorfully, but also archaically put—"he that commiteth iniquity shall not have equity." *See, e.g., Prince Mfg. Co. v. Prince's Metallic Paint Co.*, 135 N.Y. 24, 38, 31 N.E. 990 (1892). *See also Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir.1985). The facts of this case provide a classic example of the applicability of that maxim. The extent to which the hands of the defendants were soiled has already been adequately described and it ill behooves them to seek equitable relief. In the earlier litigation between these parties in which the defense of laches and its companion, equitable estoppel, were raised, the Court of Appeals had occasion to observe that a factor that is pertinent in denying a claim of laches and equitable estoppel is whether "the infringer 'has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor.'" *Gasser Chair Co., Inc. v. Infanti*, 60 F.3d 770 at 775 (Fed.Cir.1995). *See also Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944). That Infanti has engaged in particularly egregious conduct is borne out by a record which reeks of it and overwhelms his claim of laches and equitable estoppel. This opinion will not be unduly prolonged by the recitation of facts entirely supported by the record which would also convincingly establish that such delay as there may have been in commencing this action was entirely reasonable and induced by the deception practiced by the defendants. The record would also unquestionably support the conclusion that the defendants did not, in any respect, change their position in reliance upon the reasonable delay by the plaintiff in bringing them to account.

In the light of the foregoing findings of fact, the conclusion of law is inescapable that the plaintiff has carried its burden of proof not merely by a preponderance of evidence, but by evidence which is clear and convincing, that its '739 patent is valid and that the defendants have infringed it.

The conclusion of law is also inescapable that the infringement by the defendant was wilful and their wilfulness has also been established by evidence which was overwhelming. The defendants, as has been shown, were advised of the plaintiff's patent rights which they were requested to respect by letters sent to them by plaintiff's counsel. As has also been shown, their flagrant attempts to impugn the validity of the plaintiff's patent by the alteration of documents and by perjury and the subornation of perjury was a tacit recognition not only of their awareness of that patent, but also of its validity. Notwithstanding Mr. Infanti's awareness of the plaintiff's patent and of their assertion that he was infringing it, he never consulted an attorney to ascertain whether the Gasser patent was valid or whether he was infringing it. (Tr. at 356).

The prerequisites for establishing a wilful infringement are thus present, namely, that the infringer had notice of the patent rights of another and failed to exercise due care to determine whether the patent was valid and whether or not he was infringing it. Put differently, "[a] court must look at whether 'under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed.'" *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed.Cir.1992). Prudent conduct under all the circumstances would include obtaining competent legal advice be-

fore infringing or continuing to infringe, advice which Infanti never sought. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir.1996) (citing *Underwater Devices, Inc. v. Morrison–Knudsen Co., Inc.*, 717 F.2d 1380, 1389–90 (Fed.Cir.1983)).

### Trade Dress Claims

The plaintiff also seeks relief to which it claims it is entitled because the defendant has infringed its trade dress. The relief it seeks is predicated upon Section 43(a) of the Lanham Act which prohibits any person from using "any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin of his or her goods." 15 U.S.C. § 1125(a)(1)(A) (1994). The statute provides that the "person who believes that he ... is likely to be damaged by such act" may seek redress in a civil action.

▮ The policy underlying the Lanham Act is the desirability of encouraging competition that is fair; providing assurance to consumers that the product they ask for is the product they will get; protecting those who have spent time and money in presenting their product to the public and who are entitled to have that investment protected from misappropriation by pirates and cheats and secures to them their reputation and good will. *Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1068 (2d Cir.1995).

▮ Section 43(a) of the Lanham Act protects trade dress and draws no distinction between trademark and trade dress. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 2759–60, 120 L.Ed.2d 615 (1992) and provides a civil remedy for trade dress infringement. *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir.1991).

▮ To succeed in a suit for trade dress infringement the plaintiff must prove that (1) its trade dress is inherently distinctive or has become distinctive by acquiring a secondary meaning and (2) that there is a likelihood of confusion between its product and the defendants'. In addition, eligibility for protection under § 43(a) depends upon its

nonfunctionality. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–58.

▮ The first factor, inherent distinctiveness and secondary meaning is bottomed "upon the way in which the trade dress, when viewed as a whole, appears to the observer, ... that is to say, trade dress today encompasses a broad concept of how a product presented to the public looks, including its color, design, ... and all the elements that make up its total appearance." 65 F.3d at 1069. A trade dress is inherently distinctive when its "gestalt" identifies the product as coming from an identified source.

▮ The evidence adduced by the plaintiff establishing the distinctiveness of its chair and the recognition of that distinctiveness by the defendants who repeatedly offered to make "Gasser" chairs for prospective buyers can leave no doubt that the first factor of inherent distinctiveness has been satisfied.

▮ The evidence adduced also clearly established that the plaintiff's chair acquired a "secondary meaning" by the time the defendants resumed the pirating of those chairs in 1981. A frequently cited case in this circuit, *Centaur Commun., Ltd. v. A/S/M Commun., Inc.*, 830 F.2d 1217 (2d Cir.1987), defines "secondary meaning" as having been acquired when "it [is] shown that the primary significance of the [product] in the minds of the consuming public is not the product but the producer. ... Thus, the crux of the doctrine of secondary meaning 'is that the [product] comes to identify not only the goods but the source of those goods,' even though the relevant consuming public might not know the name of the producer." 830 F.2d at 1221. *See, also, L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.*, 79 F.3d 258, 263 (2d Cir.1996); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir.1992). The chairs which have been infringed came to be known as "Gasser chairs." The uncontradicted evidence documented the frequency with which Infanti's chairs were confused with Gasser's and the frequency with which orders submitted to Infanti requested that the chairs be made to resemble Gasser's. The secondary

meaning acquired by Gasser's chairs was so decisively established that to buttress that conclusion by the application of such traditional factors as extent of advertising, commercial success, the span of time over which the trade dress was exclusively used and perhaps most significantly, the intentional and flagrant attempt by Infanti to appropriate to itself the essence of the Gasser chair would be gilding the proverbial lily and yet the record convincingly reflects each of them. The distinctiveness, secondary meaning and likelihood of confusion prerequisite to trade dress protection have all been met. It remains to determine the existence of the additional requirement of nonfunctionality.

■ Nonfunctionality is a defense to a claim of trade dress infringement which a defendant bears the burden of proving. *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75–76 (2d Cir.1985).

■ In *Inwood Lab., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851, n. 10, 102 S.Ct. 2182, 2187, n. 10, 72 L.Ed.2d 606 (1982), the Supreme Court taught that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." The thrust of Infanti's defense of functionality is that components of Gasser's chairs perform a function. That argument has been foreclosed in *LeSportsac, Inc., supra,* 754 F.2d at 76, which decided that the issue of functionality must be decided by focusing on the overall appearance of the product and not by breaking it down into discrete elements which are attacked as being separately functional. Returning to the test of functionality as described in *Inwood,* a design feature is "essential" only if it is dictated by the function to be performed; "a feature that merely accommodates a useful function is not enough." 754 F.2d at 76. The design feature of the Gasser chair is not essential to the functioning of the chair anymore than the shape of a plastic container for spray products is essential to its purpose as a sprayer. *In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1341 (C.C.P.A.1982). *See, also, W.T. Rogers Co., Inc. v. Keene,* 778 F.2d 334, 339–41 (7th Cir.1985).

The functionality defense was aimed at encouraging competition and to protect advances in functional design from being monopolized. *LeSportsac,* 754 F.2d at 76. The evidence adduced at trial belies the claim that competition in the manufacture and design of stacking chairs, bar stools and casino chairs has been stifled. On the contrary, the evidence established that the competition for the manufacture of such chairs is a robust one and that Gasser neither leads nor monopolizes the field.

■ Infanti's claim that his infringement of Gasser's trade dress was justified by the need it served to replace chairs for customers who purchased Gasser chairs is flawed. That claim has no validity and was persuasively rejected in *W.T. Rogers Co., Inc. v. Keene,* 778 F.2d 334, 343–44 (7th Cir.1985) and more recently in *Villeroy & Boch Keramische Werke K.G. v. THC Sys., Inc.,* 999 F.2d 619, 621 (2d Cir.1993). The recognition of such a claim would be "an open Sesame to [tradedress] infringement." *W.T. Rogers Co., Inc.,* 778 F.2d at 344.

In sum, the defendant has not carried its burden of proving that the plaintiff's trade dress is functional.

The likelihood, indeed the existence of confusion, has been amply documented and established by the record references set out above and will not be belabored. Suffice it to say that Infanti has created considerable confusion, even among sophisticated buyers, who have been misled into believing that his chairs were Gasser's.

Having found that the defendant has infringed upon the plaintiff's patent and on the plaintiff's trade dress, it remains to fix the damages to which the plaintiff is entitled. The relevant statute is 35 U.S.C. § 284 which provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In ei-

ther event the court may increase the damages up to three times the amount found or assessed.

■ The measure of damages to which the holder of a manufacturing patent is entitled is the lost profits that would have been earned were it not for the infringement. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964). To recover those lost profits the patentee must show "a reasonable probability that, but for the infringement, it would have made the infringer's sales." *State Ind., Inc. v. Mor–Flo Ind., Inc.* 883 F.2d 1573, 1577 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990).

■ In *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978), the court applied a four-factor test that has been generally accepted as a useful, but not exclusive way for the holder of a patent to prove the lost profits to which he is entitled. Those are: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made. The successful establishment of those factors enables the court to infer that the lost profits claimed were in fact caused by the infringing sales, thus providing a prima facie case for the patentee as regards the "but for" causation requirement and satisfies its burden of proving entitlement to lost profits due to infringing sales. The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales. *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 at 1545 (Fed.Cir.1995). That burden was never sustained.

■ Where the holder of the patent and the infringer are in what has been referred to during the trial as a "niche" market, that is a market with only two suppliers, the patentee and the infringer, the "but for" prerequisite is easily satisfied. The evidence established that there was no chair on the market that provided the advantages of the patented chair for those who ordered Infanti's infringing chairs. Indeed, the frequency with which orders placed with Infanti specifi-

cally requested the "Gasser chair" and the frequency with which Infanti trumpeted his readiness and willingness to manufacture the "Gasser chair" confirm the absence of a satisfactory noninfringing alternative for the years 1983 through 1992.

*Damages*

On the issue of damages, two witnesses were called to testify. Richard B. Troxel was called on behalf of Gasser. He is the president of Capital Accounting, located in Washington, D.C. which is a consulting firm providing financially oriented services to law firms, corporations and commercial clients. He has testified on behalf of plaintiffs and defendants on seventeen occasions on the computation of damages in patent infringement actions based upon lost profits on lost sales and reasonable royalties. He holds a Masters Degree in Business Administration from the University of Minnesota and is a certified public accountant. His experience in positions of financial responsibility with large commercial enterprises before becoming a partner in the major accounting firm of Peat Marwick was impressive. In preparation for his testimony, he examined the financial statements of Gasser beginning with the year 1983. He has also examined a compilation of Infanti invoices beginning in that same year. His expertise in the computation of damages was stipulated and accepted by the court.

The virtually uncontested evidence adduced on the issue of damages which includes a series of meticulously prepared charts and the explication of the data reflected on them by Mr. Troxel is represented by Px 280 and accompanying charts lettered B through H which will be briefly reviewed.

His analysis of the damages sustained by Gasser begins with Chart F which summarizes the sales in units and dollars for the four companies referred to during the trial as players in the relevant marketplace at designated times, namely, Infanti, Shelby Williams, Mastercraft and Gasser. That chart, the data on which was not meaningfully contested, reflects that from 1983 through December 31, 1995 Infanti sold 263,546 in-

fringing chairs which, represented in dollars was $26,732,887. The testimony of Mr. Troxel, explicating the data on that chart is at pages 474–79 of the transcript.

The analysis then proceeds to Chart D which is a graphic depiction of the profits lost by Gasser on sales it would have made but for the infringement. That chart, the data on which was not successfully challenged, reflects that from 1983 through December 31, 1995 Gasser lost profits in the sum of $11,084,931 after taking into account the incremental cost of producing and selling the chairs in the sales that were lost. Mr. Troxel's explication of that data and of the regression statistics used to arrive at incremental cost and found in Chart G is found at pages 479–87 of the transcript.

 It would be an affectation of research to cite the countless cases which simply reiterate the "Georgia–Pacific" factors to be considered in determining a reasonable royalty. *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified,* 446 F.2d 295 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). To set out those fifteen factors would also needlessly burden this decision. Suffice it to say that an application of those factors to the evidence pertaining to them leads the court to conclude that a royalty of 20% of the sales of the infringing chairs is reasonable and would adequately compensate the plaintiff for the infringement. In this regard as well, the court accepts the methodology and analysis of the plaintiff's expert, Mr. Troxel, whose testimony on this aspect of damages remained entirely intact upon cross-examination.

Chart E is a graphic depiction of the data, not successfully impugned, based upon which reasonable royalties due to the plaintiff was calculated for Infanti's production and sales of infringing chairs which were not included in the calculation of lost profits for the period 1983 through December 31, 1995. That data as calculated reflected a reasonable royalty of $459,421. Mr. Troxel's explication of that chart is to be found at pages 487–89 of the transcript.

Three additional charts which complete the relevant data and the analysis thereof to support the ultimate conclusion as to the total damages suffered by the plaintiff are as follows:

Chart H takes into account the cost of additional working capital necessary to support the addition of the lost sales and calculated to be $278,695. Mr. Troxel's explication is to be found at pages 489–90 of the transcript.

Chart B represents a summary of lost profits from lost sales and reasonable royalties by year beginning in 1983 and ending December 31, 1995. The total of lost profits and reasonable royalties is calculated to be $11,265,657 arrived at subtracting from the sum of lost profits and reasonable royalties the cost of additional working capital and arriving at $11,265,657. Mr. Troxel's explication of this chart is found at pages 490–92 of the transcript.

 Adequate compensation for the loss suffered a patentee by infringement should include prejudgment interest from the date of infringement to the date of judgment. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983); *Nickson Ind., Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 800 (Fed.Cir. 1988). Although it would not be inappropriate to apply the prime interest rate to compute prejudgment interest, *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1066 (Fed.Cir.1983), the more conservative three year treasury bill rate was used to make that calculation.

Chart C depicts the total damages due to the plaintiff, including prejudgment interest, as of December 31, 1995, which was found to be $2,872.254 and which was explained by Mr. Troxel at pages 492–95 of the transcript. The total damages which the court finds was clearly and convincingly proved is $14,137,-911.

The plaintiff's exhibits 281 and 281A represent an alternative damage computation based upon the assumption that damages would be awarded beginning from the date the action was commenced—1988. Including prejudgment interest, the sum computed to be due Gasser for the total damages suffered

from 1989 through 1995 is $12,449,561. The testimony explaining that computation is at 495–97 of the transcript.

The plaintiff's exhibits 282 and 282–A represents yet another alternative damages computation based solely on a reasonable royalty. The testimony explaining those exhibits is at 497–98. Based upon a royalty rate of 20%, which the witness deemed to be reasonable, including prejudgment interest for the years 1983–1995, the sum due Gasser was computed to be $6,600,410.

Upon the assumption that damages or reasonable royalties would be awarded from the commencement of the action, i.e., 1989–1995, the royalties calculated to be due Gasser for that period was $5,967,057 as explained at pages 499–500 of the transcript.

The measure of damages which the court finds is the correct and appropriate measure to be applied is as supported by Px 280 and accompanying Charts B through H in the sum of $14,137,911.

The cross-examination of Mr. Troxel left his computations and the analysis of the relevant data supporting those computations undisturbed. Tr. at 501–09.

The defendant called as its expert on damages Dennis J. Dugan. A recitation of his qualifications was waived by the plaintiff. Although his expertise was stipulated, it is significant to note that unlike Mr. Troxel, Mr. Dugan is "an economist by trade" and was less than direct when asked by the court whether he was an accountant, as this brief excerpt from pages 780 of the transcript reveals:

THE COURT: Excuse me. I haven't looked at your resume, but are you also an accountant?

THE WITNESS: Sir, I am an economist by trade. I have worked on issues of accounting, and as a partner at Coopers—

THE COURT: I am just asking whether you are an accountant?

THE WITNESS: I am not officially a CPA.

THE COURT: You have an accounting degree? Are you a private accountant?

THE WITNESS: No, I don't.

THE COURT: Do you have a degree in accounting?

THE WITNESS: No, I don't.

I have had occasion in the past to observe that the function of an expert witness is to provide assistance to the fact finder in the determination of an issue of fact which depends upon an understanding of technical or other specialized knowledge. I have also had occasion in the past to observe that all too frequently an expert witness regards his function to be to champion the cause of the party who retains him, and by doing so diminishes his professionalism and the intellectual discipline which is the subject of his professed expertise. It saddens me to note that the expert testimony here moves me to make that observation once again as the following colloquy will confirm. The witness was being asked on cross-examination whether a lost profits computation would be appropriate where the parties compete in a niche market. Counsel not being able to elicit a responsive answer to that question after several attempts, the court intervened as follows:

THE COURT: May I try and see if I can understand it?

MR. KENNEDY: Yes.

THE COURT: Assume that the entire market consists of 50 manufacturers of pitchers. The entire market.

THE WITNESS: 50.

THE COURT: But only two of those 50 make a black pitcher. Nobody else has done it. Nobody else sells a black pitcher. Only two do.

Would a lost profits analysis be appropriate in that case?

I think that's the question.

MR. KENNEDY: That's correct.

THE WITNESS: I would say I have the same concern, because is the—the concern is a very simple concern: What are people's preferences for black things?

THE COURT: Sir, there are 50 manufacturers of pitchers. 48 make them in gray. Only two make it in black. For everybody who wants to buy a black pitcher, they have to go to either A or B. Okay.

Would a lost profits analysis—obviously, we're talking about people who want to buy a black pitcher. Assume that with respect to anybody who wants to buy a black pitcher, they would have to go to these two manufacturers. Would a lost profit analysis be appropriate?

THE WITNESS: Your Honor, I don't want to be argumentative.

THE COURT: You are not being argumentative, Mr. Dugan, but I would suggest, sir, that you are not being direct in your response.

If they are committed: Do you want me to say if they are absolutely, definitely, unalterably committed to buying a black pitcher?

Persons who want to buy black pitchers—not gray—they would have to go to A or B. Those are the only persons who can manufacture or do manufacture a black pitcher.

Would a lost profits analysis be appropriate? That's the question.

THE WITNESS: Under those rigid conditions I would say yes, it would be.

Tr. at 806–08.

The cross-examination of this witness also revealed that many of his computations were based upon assumptions that were not supported by either fact or experience. For example, he attributed an increased expenditure for the use of an aircraft upon the assumption that more marketing, more attendance at conventions, and more client entertainment—which he assumed was a necessary corollary to increased sales—would also necessarily increase the use of an aircraft and the expense incident thereto. He never spoke with anyone at Gasser to corroborate his assumption which is speculative and questionable. (Tr. at 813). He included a sum for property and other business taxes in his calculations not knowing that Gasser enjoyed a total abatement on their state and local taxes. (Tr. at 814). He fixed a sum for travel and entertainment based upon an assumption which he never sought to corroborate by speaking with anyone at Gasser, nor did he speak with anyone at Gasser to determine whether the cost of hospitalization and insurance were incremental. (Tr. at 814–15).

The egregiousness of this witness' failure to confirm the validity of his assumptions became manifest by the rebuttal testimony of Mr. Mark Gasser. That testimony revealed that Mr. Dugan's assumption that the aircraft was leased was false. The aircraft is, in fact, owned by the plaintiff, the pilot who flies it has been a full-time employee of the company for more than ten years, whose salary is the same whether he flies one day or five days per week; is assigned to other duties when he is not flying and if there would be any increase in aircraft expense proportionate to increased production, it would be *de minimis*. (Tr. at 858). Mr. Gasser also established that Mr. Dugan's assumption that the expense of travel and entertainment would increase incrementally with production was false for the reason that travel and entertainment is associated with trade shows, all of which the plaintiff already attends. (Tr. at 859). The error in Mr. Dugan's assumptions regarding state and local taxes was also made plain in that the only incremental expense would be in state income taxes which was minor. The plaintiff has a ten year total abatement on personal and real property taxes. (Tr. at 859–60). Mr. Dugan's assumption regarding royalties was wrong, there being no royalties at all paid by Gasser. His assumption regarding licenses was also wrong in that all the licenses Gasser requires have already been obtained and an increase in production would not produce a proportionate incremental expense as to those. Similarly, an increase in production would not entail an incremental expense for rent and equipment because the additional space that may be needed already exists as does the equipment. (Tr. at 859–61).

Without unduly burdening this opinion by the other deficiencies in the testimony of this witness, I would incorporate by reference pages 815–824 of the transcript from which an objective trier of facts would be driven to conclude that the testimony of this witness must be discredited in its entirety.

The court has found for the reasons elaborated above, that Infanti's infringement was wilful. Notwithstanding his notice of Gasser's patent, he unilaterally decided that

the patent was invalid, a decision he reached without any factual or legal basis since he never consulted competent counsel on the subject. The court has alluded more than once to the boldness with which he pirated the plaintiff's trade dress and infringed its patent and to the forgeries and perjuries he shamelessly committed incident to that infringement. The totality of the circumstances, including his blatant falsification of submissions in this very litigation which were not discovered until the eve of trial, makes it singularly appropriate that damages be enhanced.

Based upon the facts found and the conclusions of law reached as discussed above, the Clerk of the Court is directed to enter the following judgment:

1. U.S. Patent No. 4,106,739 issued to the plaintiff is a valid patent. The defendants have failed to sustain the burden that was theirs to prove its invalidity by clear and convincing evidence.

2. Claims 1, 2 3 and 4 of that patent have been infringed by the defendants by the sale of chairs manufactured by them with the patented protective edge. Vittorio Infanti is personally liable for the infringement.

3. The defendants Infanti Chair Manufacturing Corp. and Vittorio Infanti are jointly and severally liable for the payment of $14,-137,911 as and for lost profits, reasonable royalties and prejudgment interest as indicated above.

4. Because the infringement by the defendants has been flagrantly wilful, the damages hereby awarded to the plaintiffs are enhanced in the flat sum of $1,000,000 for the payment of which the defendants are jointly and severally liable.

5. The flagrant wilfulness of the infringement by the defendants also makes appropriate the award of reasonable attorneys' fees and costs, the amount of which is to be determined upon notice after the submission of affidavits supporting the request for such fees and costs and for the payment of which the defendants are jointly and severally liable. An amended judgment reflecting that additional determination will be entered at the appropriate time and shall not affect the finality and entry of this judgment in all other respects.

6. Infanti Chair Manufacturing Corp., Vittorio Infanti, all officers, agents and employees, and all persons acting in concert or participation with any defendant, are enjoined from manufacturing, distributing, selling, promoting or using Infanti's stacking chairs, arm chairs, bar stools and casino seating which incorporate and use the same overall appearance as Gasser's stacking chairs, arm chairs, bar stools and casino seating and which have been found to infringe Gasser's trade dress in this proceeding.

7. Pursuant to 15 U.S.C. § 1118, the defendants shall deliver up to plaintiffs' attorneys for destruction, within five (5) days of this order, all products, labels, signs, prints, packages, wrappers, receptacles and advertisements in the possession of either defendant which infringe the trade dress of Gasser's stacking chairs, arm chairs, bar stools and casino seating or which bear a depiction of one of defendants' chairs found to infringe plaintiffs' trade dress.

SO ORDERED.

*JUDGMENT*

Based upon the facts found and the conclusions of law reached as discussed in the Memorandum and Decision of June 28, 1996, and the Court finding, pursuant to Fed. R.Civ.P. 54(b), that there is no just reason for delay as to entry of a judgment, Court enters the following judgment:

1. U.S. Patent No. 4,106,739 issued to the plaintiff is a valid patent. The defendants have failed to sustain the burden that was theirs to prove its invalidity by clear and convincing evidence.

2. Claims 1, 2, 3 and 4 of that patent have been infringed by the defendants by the sale of chairs manufactured by them with the patented protective edge. Vittorio Infanti is personally liable for the infringement.

3. The defendants Infanti Chair Manufacturing Corp. and Vittorio Infanti are jointly and severally liable for the payment of $14,-137,911 as and for lost profits, reasonable

royalties and prejudgment interest as indicated above.

4. Because the infringement by the defendant has been flagrantly willful, the damages hereby awarded to the plaintiffs are enhanced in the flat sum of $1,000,000 for the payment of which the defendants are jointly and severally liable.

5. The flagrant willfulness of the infringement by the defendants also makes appropriate the award of reasonable attorneys' fees and costs, the amount of which is to be determined upon notice after the submission of affidavits supporting the request for such fees and costs and for the payment of which the defendants are jointly and severally liable. An amended judgment reflecting that additional determination will be entered at the appropriate time and shall not affect the finality and entry of this judgment in all other respects.

6. Plaintiff Gasser Chair Company, Inc. has established trade dress rights in the overall appearance of (a) stacking chairs which have a combination of the features of legs attached under the seat, a box seat, and a back with a framed appearance formed by a strip of plastic and attached to the seat by a single bracket and arranged to have the overall appearance of Gasser's 8800 Series stacking chairs as shown in attached Exhibit A *; (b) arm chairs which have a combination of the features of a box seat, and a one piece back and arms with a framed appearance formed by strips of plastic and arranged to have the overall appearance of Gasser's 900

Series arm chairs (Models L 90, 909, 915, 998) shown in attached Exhibit B; and (c) stools and chairs which have a combination of the features of a box seat and a back with a framed appearance formed by a strip of plastic and arranged to have the overall appearance of Gasser's bar stools and casino seats for its Models 3028, 3012, 1025, 4129, 5154 and KE 1720 shown in attached Exhibit C.

7. Infanti Chair Manufacturing Corp., Vittorio Infanti, all officers, agents and employees, and all persons acting in concert or participation with any defendant, are enjoined from manufacturing, distributing, selling, promoting or using chairs and seating which copy, simulate, reproduce or are confusingly similar in overall appearance to Gasser's trade dress, including Infanti's 2000 Series stacking chairs (as shown in PX 187), except for INF 2465, 2470, 2720; Infanti's 4000 Series arm chairs (as shown in PX 187), except for 4610, 4620, 4630, 4840; and Infanti's bar stools and casino seating models INF 5600, INF 5800, INF 5010, SS 11–02, SS 11–07, SS 11–10, 11–11, 11–4600, SS 11–5300 and KSB 11–4100 (all shown in PX 187).

8. Pursuant to 15 U.S.C. § 1118, the defendants shall deliver up to plaintiffs' attorneys for destruction, within five (5) days of this order, all products, labels, signs, prints, packages, wrappers, receptacles and advertisements in the possession of either defendant which infringe Gasser's trade dress or which bear a depiction of one of defendants' chairs found to infringe Gasser's trade dress.

**SO ORDERED.**

* [Editor's Note: Best copy available for purposes of publication.]

EXHIBIT A

**Stackable Seating**

Left to Right, back row: SE-8800, SE-8823, SE-8818, SE-8812, SE-8810, SE-8801; front row: SE-8817, SE-8809, SE-8815, SE-8816

# DESIGN FLEXIBILITY WITH THE 8800 SERIES

**THE GASSER CHAIR CO., INC.**
4136 Loganway ▪ Youngstown, OH 44505-1797
1-800-323-2234 ▪ 216-759-2234 ▪ FAX 216-759-9844

222

L90-04 Series Page 4 909 Series Page 6

915 Series Page 8 998 Series Page 14

EXHIBIT C

**GE90/3028-BD**
Shown w/ gold braid insert.

GE90/3012

**GE95/1025**
Shown w/ extended footrest.

**GE95/4129**
Shown w/ tapered seat
and vinyl overlay seat front.

**GE88/5154-BD**
Shown w/ gold braid insert
and vinyl overlay seat front.

**KE-1720 Series**